## 8001

### McALHANY v. MURRAY.

Real Property—Corporations.—Upon the dissolution of a corporation created for benevolent or social purposes, the land paid for by the members and the buildings erected by them is a corporate asset to be divided among the members of the corporation at the date of its dissolution or their representatives, and it does not revert to grantor. *Cases considered.*

Before B. H. Moss, Special Judge, Dorchester, October, 1910. Reversed.

Action by D. L. McAlhany against Emory Murray *et al.* in which O. B. Dukes, J. W. Fairey and Margaret Shieder intervened. The intervenors appeal.

*Mr. Walker S. Utsey,* for appellants, cite: *Property paid for vests in members:* 10 Cyc. 1327 (b) ; 48 Tex. 147 ; 9 Ency. 613 ; 56 Vt. 734 ; 38 Cal. 166 ; 15 S. C. 277 ; 35 S. C. 330 ; 44 S. C. 511 ; 54 S. C. 440 ; 3 L. R. A. (N. S.) 653 ; 119 Ga. 829 ; 54 S. C. 440 ; 18 How. 185.

*Mr. B. Lyon Weeks,* for plaintiff, contra.

*Messrs. Hunter A. Gibbes* and *J. Otey Reed,* for defendant, contra. *Mr. Gibbes* cites: *This property reverted to grantor:* 2 Kent, 282 ; Preston on Estates 250 ; 23 S. C. 297 ; 1 Bl. Com. 484 ; Angel & Ames Corp. 779 ; Dill Mun. Corp. 113 ; Field Corp. 491 ; 18 How. 480 ; Harp. Eq. 281 ;

10 Cyc. 1310; 37 L. R. A. 711; 65 L. R. A. 225; 33 L. R.
A. 576; 136 U. S. 492; Waterman Corp. 873; 102 U. S.
501; 2 Kent. 307; 33 U. S. 281; 56 U. S. 15; 59 U. S.
488; 2 Waterman 934; Marshall Corp. 170; 76 Me. 315;
Clark on Corp. 250; Harp. Eq. 281. *Dissolution of Cor-
poration:* Marshall Corp., sec. 154; 1 Smith's cases 365;
78 N. Y. 524; 3 S. C. 502.

August 11, 1911. The opinion of the Court was deliv-
ered by

MR. JUSTICE WOODS. The question to be decided in this
case is whether upon the dissolution of a corporation created
for a benevolent or social purpose, its land reverts to the
grantor or is a corporate asset to be divided among those
who are members of the corporation at the date of disso-
lution.

The facts are not in dispute, but it is necessary to make
a statement of the manner in which the legal issue arose.
A charter for fourteen years was granted to St. George's
Division, Sons of Temperance, by an act of incorporation
of December 21, 1854. (12 Stat. 321.) The purpose of
the corporation is not stated in the charter, but it is admitted
that it was the promotion of temperance by corporate organ-
ization, and that the corporation was therefore a benevolent,
and social, as distinguished from a trading or business cor-
poration. On March 25, 1855, James George by fee simple
deed conveyed a lot to Andrew Myers and other persons
named in the deed as "committee or trustees" of the cor-
poration for the consideration of ten dollars, which was
actually paid to him. The society erected on the lot a hall
for the purpose of holding its meetings, and it flourished
until 1861 when it disbanded for the reason that most of its
members had enlisted in the Confederate army. Imme-
diately after the war an effort was made to resuscitate the
organization, but it was unsuccessful; and the society has
been practically defunct since 1861. The charter expired

by its own limitation in 1868 and has never been renewed. The Sons of Temperance was in possession of the property until 1861; and D. L. McAlhany, one of the original trustees to whom the land was conveyed, continued the possession in that capacity until November 2, 1903, when he conveyed by deed to his son D. L. McAlhany, Jr., the plaintiff in this action, all his right, title and interest in the property. This deed was intended to convey what D. L. McAlhany supposed to be his interest as one of the three surviving members of the St. George's Division of the Sons of Temperance.

James George died some time between 1868 and 1903, leaving a will by which he devised and bequeathed all of his property to his daughter Louisa Murray. Mrs. Murray, claiming that the title had reverted to her as the heir and devisee of James George under a specific clause in the deed which is not involved in the consideration of this appeal, through her husband Emory Murray took possession of the property in 1905. An action was commenced against her for the recovery of the property in the name of the corporation, which was dismissed by order of the Circuit Court on the ground that the corporation was defunct and could not maintain the action; and from the judgment there was no appeal. Thereafter P. L. Horn and J. A. Dukes, two of the three surviving members of the society, commenced an action to recover the property from Louisa Murray. That action was ended by the conveyance by Horn and Dukes of their interest to Mrs. Murray.

The present action for partition was commenced in 1907 by D. L. McAlhany, Jr., as grantee of his father under the deed above recited, against Mrs. Murray as the owner of the interests of Horn and Dukes. Among other defenses Mrs. Murray set up the claim that under the specific clause in the deed above referred to the property had reverted to her as heir and devisee of James George. Mrs. Murray died during the pendency of the action and it was continued in

the name of her heirs. The referee to whom the case was referred overruled all the defenses and reported that the plaintiff was entitled to one-third interest and the defendants to two-thirds interest in the lot. On April 9, 1909, a decree was made by consent of counsel confirming the report of the referee and directing a sale of the property and a division of the proceeds, one-third to the plaintiff McAlhany and two-thirds to the heirs of Mrs. Murray. On June 7, 1909, an order was made in the case allowing O. B. Dukes, M. W. Dukes, J. W. Fairey and Margaret Shieder to intervene in the cause and set up their claim to an interest in the property as heirs of deceased persons who were members of St. George's Division of Sons of Temperance at the date of the dissolution of the corporation. Against this claim the heirs of Mrs. Murray alleged that the property on dissolution of the corporation in 1868 had reverted by reason of such dissolution to Mrs. Murray, the heir and devisee of James George, the original grantor. The cause was referred to Wm. C. Wolfe, Esq., who held that the Murray heirs were bound by the former decree and therefore could not avail themselves of the claim of reversion against McAlhany, but sustained the defense against the interveners. The report was confirmed by a decree of Special Judge Moss with a slight modification not involved here. The interveners appeal, assigning error in the holding of the Circuit Court that the real property of St. George's Division, Sons of Temperance, did not belong on the dissolution of the corporation to the persons who were members of it at that time, but reverted to the grantor by whom it was conveyed to the corporation. The statute of 1898, now section 1866 of Civil Code, will not be discussed or construed for the reason that the rights of the parties in this case arose before it was enacted.

In many decided cases *dicta* not common law will be found expressing recognition of the doctrine that, at the common law on the dissolution of a corporation its lands revert

to the grantor, but we think few cases will be found in which the point was raised and decided and the doctrine actually applied in the disposition of property by the judgments of courts of last resort. The ancient authority relied on as supporting the doctrine is the following passage from Coke on Littleton, 13b: "And so if land be given in fee simple to a deane and chapter, or to a major and commonalty, and to their successors, and after such body politique or incorporate is dissolved, the donor shall have again the land, and not the lord by escheat. And the reason and cause of this diversity is, for that in the case of a body politique or incorporate the fee simple is vested in their politique or incorporate capacity created by the policy of man, and therefore the law doth annex the condition in law to every such gift and grant, that if such body politique or incorporate be dissolved, that the donor or grantor shall re-enter, for that the cause of the gift or grant faileth."

The language of Lord Coke makes it clear that the corporations which he had in mind were the religious orders and the municipal organizations of the times. The land of the religious orders was usually acquired by gift without valuable consideration, and it was not wholly unreasonable that upon dissolution of the order the land should revert to the grantor.

Upon the dissolution of a municipal corporation, distribution of the land among the people of the community would have been inconvenient, even if there had been recognition of the right of the individuals constituting a community to an interest in the land.

The older authorities follow Coke in the statement of the rule, as will be seen by reference to 2 Bac. 32, 1 Bl. Com. 484, 2 Kyd on Corporations 516. But with the conception and development of the corporation as a means of bringing together individual resources for the promotion of the innumerable enterprises of modern life, came conviction of the injustice and absurdity of the doctrine.

Chancellor Kent thus sets out what he calls "most injurious and distressing consequences" of the dissolution of money or trading corporations under the rules laid down by the old authorities: "An absolute and unqualified repeal, at once, of a charter of incorporation of a money or trading institution, would be attended with most injurious and distressing consequences. According to the old settled law of the land, where there is no special statute provision to the contrary, upon the civil death of a corporation, all its real estate, remaining unsold, reverts back to the original grantor and his heirs. The debts due to and from the corporation are all extinguished. Neither the stockholders, nor the directors or trustees of the corporation, can recover those debts or be charged with them, in their natural capacity. All the personal estate of the corporation vests in the people, as succeeding to this right and prerogative of the crown at common law." In a note he says: "The rule of the common law has in fact become obsolete and odious. It never has been applied to insolvent or dissolved money corporations in England. The sound doctrine now is, as shown by statutes and judicial decisions, that the capital and debts of banking and other moneyed corporations constitute a trust fund and pledge for the payment of the creditors and stockholders, and a court of equity will lay hold of the fund and see that it be duly collected and applied. The death of a corporation no more impairs the obligation of contracts than the death of a private person." 2 Kent. Com. 307.

In the leading case of *Bacon* v. *Robertson,* 59 U. S. 480, 15 L. ed. 499, Mr. Justice Campbell for the Court says on the same subject: "For according to the doctrine of the text writers on this subject, the consequences are visited without any discrimination; the losses are imposed upon those who are not blameworthy, and the benefits are accumulated upon those who are without desert. The effects of a dissolution of a corporation are usually described to be, the reversion of the lands to those who had granted them; the

extinguishment of the debts, either to or from the corporate body, so that they are not a charge nor a benefit to the members. The instances which support the *dictum* in reference to the lands consist of the statutes and judgments which followed the suppression of the military and religious orders of knights, and whose lands returned to those who had granted them, and did not fall to the king as an escheat; or of cases of dissolution of monasteries and other ecclesiastical foundations, upon the death of all their members; or of donations to public bodies, such as a mayor and commonalty. But such cases afford no analogy to that before us. The acquisitions of real property by a trading corporation are commonly made upon a bargain and sale, for a full consideration, and without conditions in the deed; and no conditions are implied in law in reference to such conveyances. The vendor has no interest in the appropriation of the property to any specific object, nor any reversion, where the succession fails."

Of the American cases criticising and rejecting the doctrine we cite only a few of the more recent, in some of which the authorities are reviewed. *Shayne* v. *Evening Post Co.,* 168 N. Y. 70, 61 N. E. 115; 55 L. R. A. 777, 85 Am. St. 654. *Hopkins* v. *Crossley* (Mich.), 101 N. W. 822; *Richards* v. *Northwestern C. & M. Co.* (Mo.), 119 S. W. 953; *Huber* v. *Martin* (Wis.), 105 N. W. 1031; 3 L. R. A. (N. S.), 653; 115 Am. St. Rep. 1023; *Wilson* v. *Leary* (N. C.), 26 S. E. 630, 38 L. R. A. 240, 58 Am. St. 778; *Diamond S. I. Co.* v. *Husbands* (Del.), 68 Atl. 240. The point has never arisen for direct decision in this State, but there are *dicta* to the effect that the doctrine of Lord Coke is not sound as applied to business or trading corporations. *St. Philip's Ch.* v. *Zion Ch.,* 23 S. C., 297.

Judicial discussion and decision, it is true, has been concerned mainly with business or trading corporations, and there are many *dicta* and some authorities to the effect that business corporations, that is associations incorporated for

private gain, are to be distinguished from eleemosynary associations incorporated for charitable purposes; that the grantor cannot claim a reversion of the land or the State a forfeiture of the personal property of the former, but upon dissolution of the latter reversion of the land and forfeiture of the personal property do take place. Distinctions are also drawn between private corporations conducted mainly for the benefit of their own members, such as Masons, Odd Fellows, temperance societies, and social clubs, and corporations chartered as charities for the benefit of the general public. We are not concerned in this case with public charities, but with the property of a temperance society or lodge conducted by its own members and acquiring property by their contributions for corporate uses. Nor are we directly concerned with the question whether upon the dissolution of a division of the Sons of Temperance its personal property was forfeited to the State.

There are some broad and obvious lines of difference between trading or business corporations and eleemosynary corporations; but there is no such difference as makes reversion to the grantor of corporate real estate on dissolution of the corporation unjust and absurd in one case and fair and reasonable in the other. The difference that one kind of corporation issues shares of stock for the capital paid in and is conducted for the purpose of making money for its shareholders, while the other receives and invests money in buildings and lands or other property for the special benefit of a class or of the general public, and issues no stock, is no logical basis for holding that the rule of the common law has become obsolete and odious in one case and not in the other. In rapidity of development, in variety of organization and of enterprise, the modern eleemosynary corporation has well nigh kept pace with the modern business corporation. In its development it has reached a point entirely out of the view and conception of jurists of Lord Coke's day. Incorporated hospitals, universities, colleges, churches, fraternal

societies, and social clubs buy land, construct expensive buildings and accumulate large endowments. The idea that upon the dissolution of such a corporation the land and buildings go to one who happened to be the person who conveyed the land to the corporation seems clearly as absurd and odious as it is antiquated.

There is hardly any logical ground for rejecting the common law rule of reversion when considered with respect to business corporations that does not apply with equal force when considered with respect to eleemosynary corporations. Not only is the distinction artificial, but the attempt to apply it must lead to doubt and confusion on the bench as well as at the bar, because of the practical difficulty of classification. There are many corporations, such as fraternal societies and other like organizations, which have both business and eleemosynary features. Such associations can be placed on one or the other side of the line between business and eleemosynary corporations only on refined distinctions about which no doubt courts would differ.

The next important inquiry is whether the doctrine that the personal property of a defunct eleemosynary corporation is forfeited and its land reverts to the grantor has been established by judicial decision in this State. In *Elliott* v. *Morris,* Harp. Eq. 281, heard in 1824, the litigation was between the heirs of William Elliott and the devisees under his will. No question was made as to whether there had been a reversion on the dissolution of the Baptist Church to which the land had been conveyed; on the contrary the reversion was assumed by both parties, and the sole point decided was that the assumed reversion was to the heirs and not to the devisees of the grantor. The question now under consideration was not decided nor discussed.

The only point involved in *Attorney General* v. *Society for the Relief of Elderly Ministers, etc.,* 10 Rich. Eq. 604, decided in 1859, was whether the General Assembly was prohibited by the Constitution from amending the charter

of an existing corporation, so as to allow it to apply its funds to a purpose not within the terms of the original charter. The remark found in the opinion of the Court that on the dissolution of a corporation the real estate would revert to the grantor and the personal assets would vest in the State, is nothing more than a *dictum*.

The Circuit decree of Judge Kershaw in *St. Philip's Church* v. *Zion Church,* 23 S. C. 297, discusses the common law rule as laid down by Lord Coke and holds it to be still in force in this State with respect to eleemosynary corporations. But on appeal the case was decided on other points, and the Supreme Court, speaking through Chief Justice Simpson, expressed its doubt by reserving its final opinion on the question.

It is safe to say, then, that the question is not settled by authority in this State; and we have been able to find no strong persuasive adjudication elsewhere supporting the contention that the grantor takes the real property of an eleemosynary corporation on dissolution.. In the case of *The Late Corporation of the Church of Jesus Christ of the Latter Day Saints* v. *United States,* 136 U. S. 1, 34 L. ed. 478, the doctrine is broadly stated by the Court as one of the grounds of the decision that upon the repeal of the charter of the Mormon Church, the Congress of the United States could by legislation require that the church assets be taken as reverted and forfeited property and applied to school purposes. But the archaic common law doctrine of reverter seems a much weaker support to the judgment of the Court than the violation by the church of an act of Congress which expressly provided that violation of its terms by a corporation should result in forfeiture and escheat to the United States.

In *Wilson* v. *Leary,* 120 N. C. 90, cited above, the question arose upon the dissolution of "Oriental Lodge No. 24, I. O. O. F." The Independent Order of Odd Fellows, like other benevolent societies, has its business features, no

29—89

doubt, but its main purposes as commonly understood are charitable and social. The Supreme Court of North Carolina, ignoring the supposed distinction between business and eleemosynary corporations, repudiates in emphatic language the doctrine of reverter and forfeiture and holds that there was no reverter. In *Hopkins* v. *Crossley* (Mich.), 101 N. W. 822, the Court held that there was no forfeiture of the funds of the "Old Volunteer Fire Department of Detroit," but that on the dissolution of the corporation the funds should be distributed among the members of the association.

The true modern rule arising out of the development in importance and variety of corporate organization and enterprise, and the principle which will be found running through nearly all modern judicial thought and expression is that on the dissolution of any corporation, the corporate assets both real and personal, including debts due to the corporation, should be regarded as belonging to a trust estate in the hands of those who happen to have their custody, to be disposed of by the court of equity according to the equitable rights of interested parties. In such distribution the Court considers the claims of creditors, and of any other person who may set up claims. In the adjustment of the equities, one who has donated land in whole or in part stands on the same footing as any other contributor to the permanent property of the corporation and has no higher equity. If such grantor conveyed away his land for a money consideration alone it is manifest that there is no foundation in equity and justice for any claim that he could make to the lands or any other property of the corporation. When all the equities are satisfied the remainder of the property, if any, goes to the State just as the property of the estate of an individual goes to the State when no one appears who has any just legal or equitable claim to it.

The following language of Mr. Justice Campbell, in *Bacon* v. *Robertson, supra,* asserting such jurisdiction of the courts of equity, was used after giving the reasons why the old

rule of forfeiture to the State and reverter to the grantor was entirely inapplicable to the modern business corporation: "These just views which have afforded to wise chancellors a sufficient motive to enlarge the scope and relax the vigor of the rules of chancery proceeding, so as to bring the civil rights of individuals in whatever form they may exist, or however complicated or ramified, under the protection of legitimate judicial administration, have been adopted in the United States, not simply for the improvement of methods of proceeding, but also for the adjustment of rights and the assertion of responsibilities among the members of such associations." The reasons for the application of equitable principles to the distribution of the assets by a court of equity are as strong in this case as in that.

Applying the principle of equity jurisdiction to an incorporated volunteer fire company the Supreme Court of Michigan says, in *Hopkins* v. *Crossley, supra:* "The doctrine that upon the dissolution of a corporation its real estate reverts, and its personal property goes to the crown, is a hard doctrine that courts of equity have power to relieve against, and we think that such a rule is not generally applied in this country to corporations in which the members had a pecuniary interest."

The case of *Diamond etc. Co.* v. *Husbands* (Del.), 68 Atl. 240, grew out of the dissolution of a business corporation, but the Court discussed the subject in general terms, holding that even if the person who conveyed to a corporation for a valuable consideration could claim the reversion on dissolution of the corporation, the naked legal title would be held by him as a mere trustee for the equitable owners of the property.

In this case the record shows a conveyance for a valuable consideration actually paid to the grantor, and it is manifest that he and his heirs have no equitable claim to the land. The property was paid for and the building on it erected by the contributions of the St. George's Division, Sons of Tem-

perance, and there is no person before the Court having any equitable claim except those who were members of the order at the date of dissolution. It follows that such perosns and their representatives are entitled to the property to the exclusion of the heirs of the grantor.

It is the judgment of this Court that the judgment of the Circuit Court be reversed.